SETH F. BAIRD

*v.*

MARIANNA O. CHAPMAN.

*Filed at Ottawa May 12, 1887.*

1. LIEN—*money loaned by a son to his father—whether a lien or charge upon lands of the latter.* A son, in 1864, advanced or loaned to his father $1000, which the latter used in paying his debts, including an incumbrance on his land, which the father promised to repay, but there was no definite contract giving the son a lien on the land. The father died in 1866, and his estate was settled up in 1869, and the claim of the son was not presented against the estate. In 1883 the son filed his bill against his two sisters and mother, for a partition of the lands of his father, in which he sought to charge the land with the payment of the loan, with interest: *Held,* that the son was not entitled to have such debt made a charge or lien on the land.

2. LIMITATION—*of claim against estate.* Where a claim is not presented against an estate within two years after the grant of letters, it will be barred by the statute; and a court of equity will refuse to enforce payment of the same after a delay of eighteen or nineteen years in bringing suit, unless some satisfactory excuse is given for such delay.

APPEAL from the Circuit Court of Lee county; the Hon. JOHN V. EUSTACE, Judge, presiding.

Mr. A. C. BARDWELL, for the appellant.

Mr. JOHN D. CRABTREE, for the appellee.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill for partition, brought by Seth F. Baird, a son of Daniel Baird, deceased, against Charlotte F. Baird, the widow, and Caroline Pumphrey and Marianna O. Chapman, two daughters of the deceased, to divide a certain farm, of one hundred acres, of which Daniel Baird died seized on the 26th day of March, 1866. Baird died intestate, leaving complainant and defendants as his only heirs. No objection was interposed by defendants to a division of the farm into three equal parts between the three children of the deceased, saving the rights of the widow; but in addition to a partition, the complainant, in his bill, set up, that in October, 1864, he enlisted in the army of the United States, and received from Lee county $1000 in bonds as a bounty for so enlisting; that in December of the same year he delivered the bonds to his father, Daniel Baird, under an arrangement or understanding, in substance, that the bonds should be used in the payment of the father's debts, including an indebtedness on the farm, and that the money so advanced should be held for the use and benefit of the complainant. The bill seeks to charge the farm with the payment of the bonds so advanced, and interest thereon, and prayed that the same may be decreed a lien on the land, and that partition be made subject to the lien so created. But on the hearing, on the evidence of the respective parties, the court rendered a decree against complainant as to the claim predicated on the Lee county bonds, and ordered an equal division of the lands between the three heirs. To reverse this decree, the complainant in the bill appealed.

There is no controversy in reference to the fact that the complainant received the bonds in question from Lee county,

and in the last part of December, 1864, delivered them to
his father, but there is much conflict in the evidence in regard
to the terms and conditions of the arrangement under which
the complainant turned the bonds over to his father. It was
proven by several witnesses, that the complainant made a
present of the bonds to his father,—that they were given as
a Christmas gift. On the other hand, the complainant tes-
tified as follows: "I let father have them the latter part of
December, 1864. I offered them to him as a present, but he
said he wouldn't take them in that wây; that he would use
them in paying the mortgage on the place, but it should be
put in the place to keep for me." Mr. Austin testified for
complainant, as follows: "He said he had had Seth's $1000,
but that he should have it all back again; that he had used it
in payment on his land, but when the land was sold or divided
he should have every cent of it." Mrs. Baird, the widow, tes-
tified, that her husband said, "Seth should have it all back
again, and more with it."

There was other evidence that the deceased, in his lifetime,
made similar declarations. There was also evidence tending
to prove that Daniel Baird used the proceeds of the bonds in
payment of his indebtedness, and it is fair to presume, from
the evidence, that he intended, at some time, to repay his son
the money he had received. But we find no evidence in the
record that establishes any definite contract made between
the parties, conferring upon the complainant a lien on the
premises which a court of equity can enforce. There was no
agreement to give the complainant a mortgage on the farm,
or a lien of any other character known to the law. The com-
plainant bought in no mortgages on the land, nor did he pay
off any mortgage, and hence can not claim to be subrogated
to the rights of any prior mortgagee. No land was purchased
in the name of Daniel Baird with money furnished by com-
plainant, and the doctrine of a resulting trust does not arise.
No deeds or title papers were delivered to complainant as a

pledge or security for money, and the doctrine of an equitable mortgage can not be invoked; nor is there any evidence in the record which can be construed in such a manner as to create an express trust. Indeed, the only reasonable construction to be placed upon the evidence, viewing it in the most favorable light for complainant, is, that he furnished his father with money, which was used in discharging the indebtedness of the latter, and which was to be paid back at some future time. The money was advanced, or, it may be said, loaned, in December, 1864. Daniel Baird died on the 26th day of March, 1866. On the 17th day of April, 1866, Charlotte F. Baird was appointed administratrix of the estate, and on the 22d day of March, 1869, she rendered a final report, showing all claims against the estate paid, and she was, by order of the court, discharged. The complainant had a complete remedy at law for the collection of his claim, by presenting it for allowance in the probate court at any time within two years from the time letters of administration were issued on the estate; but he neglected to avail of this remedy which the law afforded him, and under the plain provision of the statute his claim is barred by the Statute of Limitations, which requires all claims to be presented for allowance within two years from the grant of administration. No reason or excuse whatever is shown why the claim was not presented for allowance in the probate court.

But aside from the Statute of Limitations, the doctrine is well settled that courts of equity will refuse to lend their aid to a party who has been guilty of *laches* in asserting his rights. Here, the defence of *laches* was set up in the answer, and the only excuse attempted, in the evidence, for a delay of nineteen years, to use the language of complainant himself, is the following: "The reason I have so long delayed urging my claim against the real estate is, that I didn't think it needed to be put in until the place was divided, and didn't suppose there would be any trouble about it then." The com-

plainant resided in the neighborhood where the property was located, from the time he loaned the money, in 1864, until 1883, when he filed his bill. He knew all the facts in regard to the transaction. Under such circumstances, the attempted excuse for the delay can avail nothing. The complainant knew his rights, and was bound to assert them within a reasonable time, which was not done. The fact that complainant may have supposed that he was not required to assert his claim until the farm was divided, affords no excuse for the delay. It was his duty to inform himself in regard to his rights. Neither ignorance of his rights, nor a failure to inform himself in regard to them, can be relied upon as a justification for the delay.

The decree of the circuit court will be affirmed.

*Decree affirmed.*